## Matthews Olison v. The State.

### No. 6902.   Decided June 7, 1922.

**1.—Murder—Practice in Trial Court—Change of Venue.**

In the absence of abuse of discretion on the part of the trial court in refusing to grant a change of venue there was no reversible error.

**2.—Same—Charge of Court—Murder—Manslaughter.**

Where, upon trial of murder and a conviction for that offense, appellant complained because the court submitted the issue of murder, and that the facts only showed manslaughter, held: that this court is not authorized to say that the issue of murder was not raised by the testimony, or that the court is not justified in submittting the same to the jury, and cannot say at this time as to whether the facts justify a conviction for more than manslaughter.

**3.—Same—Confession—Evidence—Article 743, C. C. P.**

Where the appellant had testified and the State introduced a portion of a confession made by defendant while confined in jail, but no objection was urged to the charge for the omission to charge on voluntary confessions and no special charge was requested, the same cannot be held fundamental error Under Article 743, C. C. P.  Following Richardson v. State, 239 S. W. Rep., 222.

**4.—Same—Evidence—Res Gestae—Rule Stated.**

Where there was nothing in the record which indicated the existence of any facts which would take the statement of the witness out of the realm of res gestae, there was no error in admitting the same in evidence.

Appeal from the District Court of Hunt.   Tried below before the Honorable Geo. B. Hall.

Appeal from a conviction of murder; penalty, fifty years imprisonment in the penitentiary.

The opinion states the case.

*R. L. Porter, Jr.,* and *B. F. Looney,* for appellant.

*R. G. Storey,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Upon conviction for murder appellant was condemned to confinement in the penitentiary for fifty years.

Application for change of venue was filed by appellant.   The evidence adduced upon a hearing of the application is before us.   Without setting out the same in detail, we are of opinion, after a careful review thereof, that the same does not show any abuse of discretion on the part of the trial court in refusing to grant the change.   Appellant was indicted at a special term of the court and his case set

for trial a few days after the indictment was returned, but upon application for continuance presented by appellant the case was passed until the regular term of court. We gather from the record that in one locality where deceased lived there was considerable excitement and prejudice existing against appellant, and disappointment expressed by parties from this locality that the case had been continued. The sheriff, anticipating this had moved appellant to another county. The night after the case was continued a crowd, variously estimated at from fifty to seventy-five men, appeared at the jail for the purpose of getting appellant and dealing with him summarily. Upon being assured by the jailer that he was not there, and a committee from the crowd being permitted to investigate the jail, the crowd immediately dispersed without any confusion. There seems to have been at no other time any demonstration against appellant, and there is nothing in the record to indicate that the one mentioned was indulged in by the citizens generally from over the county. The record is silent as to the examination of the veniremen called from which to select a jury, and the bill does not even show that appellant exhausted his peremptory challenges. The record justifies the conclusion that any feeling against appellant was confined to one locality in the county, and was not of that wide-spread character which would have required the court to transfer the case.

Appellant complains because the court submitted the issue of murder, insisting that the evidence raised at the utmost only the issue of manslaughter. A consideration of this question necessarily brings in review the entire evidence. Appellant, a negro tenant, resided with his wife a short distance from the residence of Matt Shanks, his landlord. The deceased was a young white man living about two miles from the Shanks home. Appellant and deceased had known each other for some time and were on good terms prior to the day of the killing. In the afternoon of June 9, 1921 appellant together with his brother, Ben Olison, and his brother's wife and sister, drove up in a wagon, stopping in the yard near the cabin. At this time Harrison Shanks, a white man and brother of Matt Shanks, and deceased were immediately in front of the cabin door. Shanks was on the ground and deceased was seated on his horse, appellant's wife being in the cabin. There is some conflict in the evidence at this point as to whether deceased had his horse's head actually in the door or only near the door to the cabin. At all events, after the negroes alighted from the wagon they came towards the cabin door and appellant requested deceased to move the horse from the door. There is also some conflict as to the manner and tone of this request. Whatever may have been the manner of appellant, deceased, who was intoxicated at the time, took offense at the request, became angry and resentful and his conduct was of such a character that his friend, Harrison Shanks, took the horse by the bridle rein, led it out of the yard into the public road

and up the road a short distance to his, Harrison Shanks', residence. Appellant and his witnesses contend that as they left the house either deceased or Shanks said "There will be another day coming." Appellant, addressing Shanks, told him that he had already requested him to stay away from his house when he (appellant) was not there. After reaching Shanks' house deceased asked the latter for his pistol, and upon being refused seems to have hunted over the house for it, turning up the beds and disarranging things generally. Upon expressing his determination to return to the negro cabin Mr. and Mrs. Shanks both tried to dissuade him, but the deceased in a few minutes went back to the cabin. Mr. and Mrs. Shanks were not near enough to hear what occurred. Appellant and his witnesses assert that deceased demanded that he come out of the house, repeatedly asking what appellant meant by telling him to get his horse away from the door. Appellant replied to this that he meant no harm by it, but only wanted him to get his horse out of the door in order that they might come in, and that was no place to have a horse anyway. Appellant and his witnesses say that deceased, failing to get appellant to leave the cabin drew his knife and threatened to "cut appellant's head off;" that appellant, who had been sitting in the door of the cabin, immediately got up and started to draw his own knife, but because of the protests from the negro women did not do so. After a little while deceased went back to the Shanks house and left on his horse, going in the direction of his home, stating at the time, according to the testimony of Mrs. Baggett "that he would not be run over by any negro." In about an hour he returned. As he passed the cabin appellant's testimony is to the effect that he asked a brother of appellant if the latter was there, and requested that he come out in the road and settle the matter. Appellant refused to go and deceased rode on to the Shanks house, hitched his horse and returned to the negro cabin on foot. Shanks and his wife again tried to persuade him not to go. Mr. Shanks went into the house, but Mrs. Shanks sat in the door watching deceased as he approached the negro cabin. She says at the time the first shot was fired deceased was standing in front of the cabin with his arms folded; that she saw no demonstration of any kind on his part; that the first shot was fired from the direction of the cabin; that she saw the smoke from the discharge of the gun. Appellant and his witnesses state that when deceased reached the cabin he again demanded that appellant come out and settle the matter; that appellant protested that there was nothing to settle; that he had simply asked him to take his horse away from the door and that there was nothing to discuss; that he meant no harm by the request, and pleaded with the deceased to go away and let him alone. According to their testimony after deceased found he could not get appellant out of the cabin deceased finally drew his pistol, stating "I will kill you anyhow, you s— b——," and fired just as appellant wheeled in an effort to get out of

the door. The shot struck appellant in the lift side below his shoulders, making a flesh wound across the back. Appellant then claims to have grabbed his gun, which was near the door and fired twice at deceased from the door. After deceased had fallen appellant struck him in the forehead with the gun, breaking it with the blow, claiming upon the trial that at the time he did so appellant was still undertaking to fire at him with his pistol. The State introduced a portion of a confession made by appellant which contradicts his testimony given upon the trial in some particulars, and which is to the effect that at the time he struck deceased with the gun deceased was waiving his hands at him, from which he understood that he was trying to get him not to hit him. The theory of the State was that appellant did not fire from the door of the cabin, but that while deceased was talking to appellant's brother appellant came around the house firing at deceased from the corner thereof. Evidence was introduced tending to show that shots entering the well curb came from the corner of the house, rather than from the door. The foregoing statement of the salient facts in the case makes it apparent that regardless of what occurred at the time deceased returned to the negro cabin the last time the issue of manslaughter stands out preeminently in the case. We would not, however, be authorized to say that the issue of murder was not raised by the testimony, or that the court was not justified in submitting it to the jury. There is no question but that the deceased was the aggressor in view of the undisputed fact that he returned to the cabin on both occasions, and according to the testimony of appellant and his witnesses undertook to draw appellant into a difficulty. The details as to what occurred must be for the determination of the jury. We do not feel called upon at this time to express an opinion as to whether the facts justify a conviction for more than manslaughter.

After appellant had testified the State introduced a portion of a confession made by him while confined in jail. Objection was interposed that the same was not made voluntarily and evidence pro and con was heard by the court upon this issue in the absence of the jury. We deem it unnecessary for the purpose of this discussion to set out the testimony, but therefrom we think the court was not in error in permitting excerpts from the confession to go to the jury. The trial court did not submit the issue as to whether the confession was voluntary. No objection was urged to the charge for this omission and no special charge was requested supplying it. It is now urged before this court that such an omission was a fundamental error and should be considered by us although raised for the first time in motion for new trial. Under the uniform decisions since the amendment to Article 735-743, C. C. P., such omission from the charge can not be regarded as fundamental error, but must be raised by objections to the charge or by special instruction timely requested. Richardson v. State, 91 Texas Crim. Rep., 318, 239 S. W. Rep., 222, and cases col-

lated under Notes 50 and 62, Art. 743, Vernon's C. C. P., page 519 and 525.

Pliney Olison, the wife of appellant's brother was present at the time of the homicide, being an eyewitness thereto. Appellant offered to prove by her that within four or five minutes after the homicide appellant returned to the cabin and while lying on the bed stated that "he knew the Bible commanded 'Thou shalt not kill,' but that he did not feel that he would be held responsible because he had to do it to protect himself." This testimony was offered as a res gestae statement but was objected to by the State as a self-serving declaration, and was excluded by the trial court. From the standpoint of appellant and his witnesses deceased had been the aggressor throughout the transaction. Appellant had made a request of him to remove his horse from the door, a request which was clearly within appellant's rights. Deceased had resented it, and returned to the cabin on more than one occasion seeking to raise a difficulty. Appellant had been shot by him, not more than four or five minutes before the statement was made. There is nothing in the bill or in the record which to our minds indicates the existence of any facts which would take the statement offered out of the realm of res gestae. It appears that appellant had only made one statement prior to the one inquired about. Upon hitting deceased with the gun appellant's wife asked him if he had killed deceased, to which appellant replied that he had. As we gather the facts from the record he immediately went into the house and laid down on the bed, making the statement the exclusion of which is complained of as error. We deem it unnecessary to cite or discuss cases which may be found reported upon the issue of res gestae. It has been held in many of them that time alone is not the essence of the question, but that after all, the matter to be determined is: was the statement a spontaneous speaking of the facts themselves through the mouth of the party, or was it only a recital by him of the facts of past events? We have not been able to escape the conclusion that the learned trial judge fell into error in excluding the offered testimony. We may reasonably infer that appellant was suffering and bleeding from the wound received in the encounter when the statement was made so shortly after the difficulty ceased. There had been no time for reflection or fabrication. We have been able to reach no other decision than that it was clearly within the res gestae rule.

For the error committed the judgment of the trial court must be reversed and the cause remanded.

*Reversed and remanded.*